**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANN MEEHAN,** | ) | |
| | ) | **Case No. 16 C 10481** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LOYOLA UNIVERSITY OF CHICAGO,** | ) | |
| an Illinois Not-for-Profit corporation; | ) | **Jury Trial Demanded** |
| **ROBERT PAPROCKI; and ALICIA ROMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, Ann Meehan ("Meehan"), through her attorneys, complains against the

Defendants, Loyola University of Chicago ("Loyola"), an Illinois Not-for-Profit corporation,

Robert Paprocki ("Paprocki"), and Alicia Roman ("Roman"), and each of them, as follows:

### I. NATURE OF ACTION

1.      This is an action brought against Defendant Loyola pursuant to the Americans

with Disabilities Act of 1990, 42 U.S.C. Section 12101, *et seq.*, ("ADA"), Public Law 101-336,

and 42 U.S.C. Section 2000e-5(f)(3), the ADA Amendments Act of 2008, Public Law 110-325,

122 Stat. 3555 ("ADA amendments") (referenced together as the "ADA" or "the Act"), and its

implementing regulations at 29 C.F.R. Part 1630, for disability discrimination, failure to

accommodate, and hostile work environment.  Moreover, this is an action brought against

Defendants, Paprocki and Roman, and each of them, pursuant to 42 U.S.C. §§ 1983 and

1988, and the Fourth and Fourteenth Amendments to the United States Constitution, as well as

under the statutory and common law of the State of Illinois, including intentional infliction of

emotional distress, invasion of privacy *via* intrusion upon seclusion, false arrest, assault and

1

battery. This Court has supplemental jurisdiction over the state law and common law claims pursuant to 28 U.S.C. Section 1367.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343.

3. Venue is appropriate under 28 U.S.C. § 1391(b), because the Defendant Loyola conducts business in and all facts giving rise to the allegations herein occurred within the Northern District of Illinois.

## III. PARTIES

4. Plaintiff is a citizen of the United States and the State of Illinois.

5. Defendants, Paprocki and Roman are citizens of the United States and the State of Illinois.

6. At the time giving rise to the allegations herein, Defendant Paprocki was a sworn police officer acting under color of law and within the course and scope of his employment for Defendant Loyola.

7. At the time giving rise to the allegations herein Defendant Roman was a sworn police officer acting under color of law and within the course and scope of her employment for Defendant Loyola.

8. The Defendant Loyola is an Illinois Not-for-Profit corporation, *inter alia*, has an art museum entitled Loyola University Museum of Art, hereinafter referred to as ōLUMA,ö where Meehan worked at the time the allegations giving rise to this action accrued.

## IV. FACTS

9. Defendant Loyola hired Ms. Meehan in 2005 to serve as its LUMA curator of education.

10.     In her role as curator, *inter alia*, Ms. Meehan developed and managed educational programs that exhibited the spiritual in art.  She trained and managed docents, worked with Northwestern University's Cognitive Neurology and Alzheimer's Disease Center to create programming for people with memory loss and their care partners, collaborated with Loyola's School of Education to integrate art across the curriculum at Chicago Catholic schools, using Common Core standards, developed outreach programming for underserved youth, including Latinos, African Americans, immigrants and refugees, and initiated and chaired the Faculty-Staff Advisory Committee to bring together people from across the university to brainstorm ideas as to how to promote LUMA's exhibitions and programs.  Also, she curated exhibitions of art by K-12 students.

11.     In addition to curator responsibilities, Defendant Loyola had Ms. Meehan administer internship programs and serve as chief editor for its quarterly newsletter.  Also it required Ms. Meehan to edit grant proposals, didactic labels and panels, and catalogues.

12.     Plaintiff served as LUMA's curator from approximately June of 2005 through November 10, 2014.   This was an exempt management position and was one of the three top positions at LUMA.

13.     To perform the essential functions of the job for Defendant Loyola the hours Ms. Meehan had to work per week varied. When evening programs occurred Ms. Meehan worked until the conclusion of such programs.  Upon the opening of an art exhibition Ms. Meehan worked at times during weekends and approximately 10 to 12 hour days to prepare for the art openings.

14.     Generally Defendant Loyola permitted Ms. Meehan to set her own hours.

15. For instance, there were months that Ms. Meehan commenced her work-day at approximately 6:30 a.m. and at other times at 9:30 a.m.

16. In 2006, Ms. Meehan was diagnosed with bi-polar disorder.

17. Following her diagnosis, in or about 2007, Ms. Meehan disclosed to her supervisor Jonathan Canning that she suffered from bi-polar disorder.

18. Despite her disability, Ms. Meehan continued to work for Defendant Loyola without taking any medical leaves as a result of her bi-polar disorder prior to 2014.

19. Defendant Loyola gave Ms. Meehan a merit increase every year from 2006-2013.

20. Defendant Loyola gave Ms. Meehan only two formal performance reviews, one in 2008 and the most recent in 2012. Defendant Loyola's 2012 performance review of Ms. Meehan was good- on a scale of 1-3, all of the ratings either were a 2.5 or a 3. Defendant Loyola included the following comments in the 2012 review:

"Very good at engaging three Catholic Schools in FY12 with good feedback from students and teachers. Ann trained docents to specifically work with school groups resulting in a new specialization for docent training."

"Good effort in all programs for youth and adults with the exception of Lunch at LUMA which is rethought for FY13"

"Very good in creating unique programs."

"Ann is very sensitive to Loyola's mission incorporating the Jesuit vision of educating the whole person through the LUMA education programs that inspire and teach a multicultural approach to the visual arts."

"Very good with training interns and excellent with docent training and cultural partners."

"Very good, but has the same frustrations in organizing education programs that LUMA staff has with their own programs since so much is dependent on the final information for rotating exhibitions with enough lead time to meet deadlines."

"Budgeting and understanding the grant process needs further education. Very good at working with LUC academic depts. in university wide programs."

4

21.     Defendant Loyola's Supervisor's Comments in the 2012 Comment Section of Ms. Meehan's review included:

> "Ann Meehan maintains an education program that is larger than most university museums of similar size, directing her programming to internal and external constituencies, unlike museums that are located in campuses that are not on a highly trafficked big city street. Ann has succeeded in engaging many of the LUC faculty through the LUMA faculty and staff committee that advises on educational programs. Ann's administration and implementation of the crucial docent program is excellent and the docents are appreciative of the art history training they receive."

22.     Defendant Loyola recognized Ms. Meehan's good writing skills. As a result, it requested that she perform tasks that were in addition to her curator responsibilities that others used to perform, such as grant writing and editing various projects.

23.     Due to Defendant Loyola requiring her to perform additional non-curator tasks, Plaintiff had to work harder and longer hours. The additional responsibilities Defendant Loyola placed on Ms. Meehan also meant that her core curator responsibilities could not be completed as timely as she had done in the past.

24.     Compounding the challenges created by the additional work were Ms. Meehan's elderly parents both of whom have Parkinson and Alzheimer's diseases who lived in New York and needed assistance.

25.     On August 5, 2014, Defendant Loyola's Director of LUMA and her supervisor Jonathan Canning met with Ms. Meehan to work on a plan together that would enable Ms. Meehan to perform her essential tasks and care for her parents.

26.     Defendant Loyola agreed during the August 2014 meeting to re-assign to others some of the additional non-curator duties that Ms. Meehan had been performing.

27.     In October 2014, a major exhibit that Ms. Meehan had an enormous amount of editing responsibilities closed.  Following Defendant Loyola's closure of this exhibit, Ms. Meehan was scheduled to go on a vacation in Ethiopia on October 8th and return to the office on October 27, 2014.

28.     Defendant Loyola received an email from Ms. Meehan on October 15, 2014 that she returned to Chicago early because a man at a hotel in Gondar Ethiopia sexually assaulted her. In the same email she explained that she would need a few days to recover, to respect her privacy, to not ask questions about the assault, and that she would "slowly ease" her "way back into life."

29.     Defendant Loyola observed Ms. Meehan return to work on Friday, October 17, 2014, two days following this email, when she resumed some of her duties.

30.     Since she was officially supposed to be on vacation through October 26th, Ms. Meehan debated whether or not to return to work full-time and change her out-of-office message on her computer.

31.     Upon her return to work, Loyola began subjecting Plaintiff to a hostile work environment.  For example, the following Monday, October 20th, Defendant Loyola started pressuring an ill Ms. Meehan to decide whether to indicate if her time was sick or vacation even though she was performing some of her work duties from home and from her office at Defendant Loyola.

32.     Defendant Loyola's continuous pressure on Ms. Meehan to make a decision adversely affected her mental disability thereby worsening her condition.

33.     On October 21, 2014 Defendant Loyola saw that Ms. Meehan was in her office. Without discussing the situation with her or seeking clarification from her, Defendant Loyola directed her to obtain a physician's release as a result of the email Ms. Meehan sent the day

before in which she stated that the emails concerning whether she was still on vacation was upsetting her "greatly, especially since [she had] been in bed all weekend with what [she hoped] is not malaria." Ann's comment concerning malaria was made in jest.

**Ann suffers her first manic episode**

34.     Defendant Loyola was aware that Ms. Meehan had bi-polar disorder, as she had previously disclosed her condition to her supervisor Jonathan Canning.

35.     In an email dated October 23, 2014, Defendant Loyola's LUMA director sent an email to its Human Resources ("HR") personnel that because of Ms. Meehan's "manic behavior" she should be put on "some sort of leave."

36.     Despite Defendant Loyola knowing that Ms. Meehan had bi-polar disorder and its observation that she was having a manic episode, it continued to pressure her regarding deadlines, her schedule, and to change her out of office notation on her email rather than endeavoring to ask whether she needed an accommodation to assist her to perform her essential job duties.

37.     Defendant Loyola's increasing pressure on Ms. Meehan, sometimes multiple times per day, caused Ms. Meehan to meet with Defendant Loyola's HR on October 24, 2014 to formally advise HR that she suffered from bi-polar disorder with the hope that HR would speak with Ms. Meehan's supervisors to ease their pressure on her.

38.     Once Defendant Loyola was on formal notice of Ms. Meehan's bi-polar disorder, its attitude toward her changed.  Whereas, for instance, when she had difficulty with her parents' illness two months earlier in August, Defendant Loyola was sympathetic and accommodated her needs, Defendant Loyola now became increasingly dismissive toward Ms. Meehan and did not accord her the level of professionalism as it had done prior to it formally becoming aware of her mental disability.

39.     Defendant Loyola, without any input from Ms. Meehan, on October 24, 2014, determined that Ms. Meehan should be out on a medical leave until she provided a note from a doctor that she could return to work.

40.     Defendant Loyola received the doctor's note on October 25, 2014 that Ms. Meehan was cleared to return to work.

41.     Defendant Loyola continued to benefit from Ms. Meehan's hard work.  Despite Ms. Meehan advising that she had an upper respiratory infection and was ill from her mental disability, she worked nine hours straight in the office on October 28, 2014 to meet the deadlines imposed on her by Defendant Loyola.

42.     At the same time, Defendant Loyola observed that Ms. Meehan's manic condition was progressing.  For instance, Ms. Meehan was observed twice organizing silverware in its kitchen that she had donated to Defendant Loyola.

**Defendant Loyola fails to engage Ann in the interactive process per the ADA**

43.     Again, without discussing with Ms. Meehan what if any reasonable accommodation she needed, on November 4, 2014, Defendant Loyola informed Ms. Meehan that she had to complete her work during a 9:00 a.m.-5:30 p.m. schedule Monday through Friday.

44.     No other similarly situated employee was required to work during regular business hours from Monday through Friday only.  In fact, over the previous 9 ½ years that Ms. Meehan had worked at LUMA she never worked a 9:00-5:30 five day per week schedule, especially considering that her job required her to staff evening programs and work weekends to meet exhibition goals.

45.     Ms. Meehan realized that her mental condition was deteriorating and she conceived of a plan with her psychiatrist and chiropractor to improve her medical condition.  She

intended on presenting her plan to Defendant Loyola at a meeting that was scheduled for November 7th.

46.     At the November 7, 2014, meeting with Defendant Loyola, Ms. Meehan had her medical plan with her and was prepared to ask for a reasonable accommodation that would have allowed for her to perform the essential functions of her job while seeking medical attention for her mental disability.

47.     Defendant Loyola would not let Ms. Meehan participate during the meeting, so she could not share her medical plan and request an accommodation under the Americans with Disabilities Act (õADAö).

48.     Instead, during this meeting, Defendant Loyola disciplined Ms. Meehan for failing to advise her supervisor of her illness early enough in the day on November 5th and for failing to report to work that day.

49.     Besides Defendant Loyola not permitting Ms. Meehan to speak during this meeting, Defendant Loyola berated her whenever she tried to open her mouth.

50.     At the end of the November 7th meeting, Defendant Loyola handed Ms. Meehan the Disciplinary Report of Conference, pamphlets on taking leave under FMLA and information on its Employee Assistance Program.

51.     Defendant Loyola, without notifying Ms. Meehan, sent a notice to its Loyola police officers on November 9, 2014, that Ms. Meehan could not enter LUMA during non-business hours and that she should õbe refused access and escorted out of the museumö if she is seen before 8:30 a.m.

52.     Based on information and belief Defendant Loyola never put any other similarly situated employee on a police watch list and deny access to an exempt employee to the employee's office outside of business hours Monday through Friday.

53.     On the next day, November 10, 2014, Defendant Loyola observed that Ms. Meehan had difficulty using the photocopier, which made her late for a docent meeting.

54.     As a result of the mental difficulties Defendant Loyola observed Ms. Meehan had at work on November 10th, it met with Ms. Meehan and told her that she should go on a medical leave starting immediately and that she should leave for the day.

55.     Ms. Meehan was distressed again that Defendant Loyola was ordering her to take a leave without giving her an opportunity to discuss her medical plans.

56.     Observing that she was distressed, Defendant Loyola called its police to escort Ms. Meehan out of the office.

57.     At the time Defendant Loyola's police arrived, Ms. Meehan was calmly chatting with HR and then chatted pleasantly with the police.  Defendant Loyola's police who responded consisted of Defendant Paprocki and Defendant Roman.

58.     Defendants Roman and Paprocki were not informed by Defendant Loyola that Ms. Meehan suffered a mental disability, was still an employee, and was merely on a medical leave.

59.     Rather Defendant Loyola gave Defendant Roman the impression that Ms. Meehan was "not allowed on the premises due to a termination of her employment."  *See Exhibit A* attached to this Complaint, which is page 2 of 2 of the Chicago Police Department Incident Report.

60.     Defendant Loyola's HR and Defendants Roman and Paprocki escorted Ms. Meehan to her office where she took her purse and coat.

10

61.     Defendants then escorted Ms. Meehan to the outside of her office building.

62.     Upon reaching the outside, Ms. Meehan was confused and realized that she needed additional items from her office, such as her medications.

63.     She then asked Defendants Roman and Paprocki if she could go back to her office to retrieve additional items.

64.     In response, Defendants Roman and Paprocki informed Ms. Meehan that she was not allowed on the premises.

65.     Ms. Meehan then called her boyfriend, also an employee of Defendant Loyola, from Rush Street to assist her.

66.     Since she had difficulty hearing outside, Ms. Meehan entered the lobby of her office building, which is a place that is open to members of the general public.

67.     As soon as she entered, Defendants Paprocki and Roman ordered her to leave, to which Ms. Meehan calmly responded that she was trying to call her boyfriend and could not hear him from the outside.  Calmly Ms. Meehan vacated the premises upon direction by Defendants.

**Defendants Paprocki and Roman falsely arrest Ann at Defendant Loyola's behest and interfere with her civil rights**

68.     Finally, when Ms. Meehan briefly spoke with her boyfriend, he told her to meet him by their office building on Rush Street.

69.     Defendant Roman saw Ms. Meehan on Rush Street, a public way, where Ann was waiting for her boyfriend.

70.     Defendant Roman yelled at Ms. Meehan to leave and told her she would be arrested for trespassing if Defendants saw her again.

71.     Based on information and belief, Defendant Loyola moved Defendant Roman from its Lakeshore to its Water Tower campus because of brutality complaints against Defendant Roman.

72.     Bewildered, Ms. Meehan went up the street into the Argo Tea, an establishment open to members of the general public.

73.     Defendant Roman then radioed Defendant Paprocki and told him that Ms. Meehan was still there and that they õwere going to have a problem.ö

74.     Defendant Roman observed Ms. Meehan going into the Argo Tea.

75.     Defendant Paprocki then instructed Defendant Roman to follow Ms. Meehan into the Argo Tea.

76.     Defendant Roman followed Ms. Meehan into the Argo Tea and saw her enter the womenøs bathroom.

77.     Defendant Roman advised Defendant Paprocki, who by now was in the Argo Tea, that Ms. Meehan was in the bathroom.

**Defendants invade Ann's privacy and batter her**

78.     Defendant Roman asked the Argo Tea barista for the key to the womenøs bathroom.

79.     Ms. Meehan heard Defendant Roman ask for the key and opened the door stating, õhere I am,ö because she was scared that she would be intruded upon in the privacy of the bathroom.

80.     Defendant Roman then wedged herself into the bathroom, forcefully gripped Ms. Meehan on the arm and proceeded to push her out of the Argo Tea with Defendant Paprocki behind her.

81.     As a result of Defendant Roman forcefully gripping Ms. Meehan's arm and pushing her, Ms. Meehan suffered extensive bruising, which caused her to be in pain for some time.

82.     Not understanding why she was being removed from a women's bathroom open to members of the general public, Ms. Meehan "was trying to come out of the officer's grip."

83.     Defendant Roman and Defendant Paprocki took Ms. Meehan's actions as battery and arrested her for criminal trespass and battery.

84.     Upon Defendants having Ms. Meehan arrested, she was taken to the Chicago Police station where she was without her medications for approximately 12 hours.

85.     Defendants pressed charges for criminal trespass to land and battery.

**Ann suffers severe emotional distress as a result of Defendants' cruel conduct**

86.     As a result of Defendants' actions, Ms. Meehan suffered severe mental trauma.

87.     On November 18, 2014, Ms. Meehan checked herself into an inpatient treatment facility at Northwestern Hospital for people who suffer mental disabilities.

88.     On December 2, 2014, Ms. Meehan was released from Northwestern Hospital.

89.     Still suffering from Defendants' actions, two days later on December 4, 2014 she began an intensive outpatient treatment program at Rush Day Hospital.

90.     As a result of Defendants' conduct, to date Ms. Meehan receives medical care to learn how to cope with the severe emotional trauma to which Defendants subjected her and has incurred medical expenses.

91.      On February 25, 2015, Defendant Loyola sent a formal letter to Ms. Meehan alleging under the ADA it was engaging her in the interactive process and wanted to know what if any reasonable accommodation it could provide to enable her to return to work.

92. On March 3, 2015, Defendant Loyola sent a request to Ms. Meehan's doctor requesting medical information.

93. In response to Defendant Loyola's request, Ms. Meehan's doctor opined that he could not estimate a date within which she could return to work since her medical condition was predicated on the "legal situation," *i.e.* pending criminal case that Defendant Loyola continued to press against Ms. Meehan for which no trial date had been set.

94. Specifically, Defendant Loyola was advised by Ms. Meehan's doctor, in his March 2014 letter, that "in [his] clinical experience, that the manic behavior, which formed the original basis for Ms. Meehan's disability and medical leave of absence is also the behavior that her *employer has used as a basis to bring charges against her*. The *charges and legal case* clearly add to her stress level and *interfere with her recovery*."

95. Because it was unknown when the criminal matter would conclude and that the criminal case was the impediment to Ms. Meehan's medical recovery, *inter alia,* in response to Defendant Loyola's February 25, 2015 ADA correspondence, on March 17, 2015 counsel for Ms. Meehan sent a letter to Defendant Loyola to endeavor to resolve the parties differences, with the intention that the parties develop a reasonable work accommodation that would have enabled Ms. Meehan to return to work by a date certain.

96. Defendant Loyola was not interested in discussing with counsel Ms. Meehan's matter.

97. Instead, on March 30, 2015, Defendant Loyola sent a letter to Ms. Meehan informing her that when her "LTD eligibility ends, [her] employment with Loyola will be terminated. . ."

98. Almost a year after Ms. Meehan was arrested, on November 4, 2015, the criminal trial took place.

99. The judge who heard the criminal proceeding was never advised of Ms. Meehan's mental disability.

100. The judge found Ms. Meehan *not* guilty of criminal trespass to land but guilty of battery.

101. Ms. Meehan was ordered to a year of supervision only and no physical contact with Defendant Loyola.

102. Since the middle of 2015, Ms. Meehan has searched for gainful employment.

103. The conviction as a result of the actions by Defendant Loyola has made it difficult for Ms. Meehan to find gainful employment.

104. Thus far no potential employer has agreed to hire Ms. Meehan, a professional with a criminal background.

105. Ms. Meehan has had to undergo further embarrassment because she has had to explain her criminal background simply to be considered for volunteer positions that she had hoped would lead to gainful employment.

106. This too has exacerbated Ms. Meehan's mental disability for which she continues to undergo medical treatment and incur medical expenses.

107. Because Ms. Meehan continues to treat, she remains certified to receive Long Term Disability Benefits.

**Count I- ADA Discrimination as to Defendant Loyola**

108. Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

109.     Defendant Loyola is an "employer" within the definition of Section (5) of the ADA as amended [42 U.S.C. Section 12111(5)].

110.     Ms. Meehan is an "employee" of Defendant Loyola within the definition of Section (4) of the ADA as amended [42 U.S.C Section 12111(4)] and a "qualified individual with a disability" as per Section (8) of the ADA as amended [42 U.S.C. Section 1211(8)].

111.     According to the ADA Amendments Act of 2008 ("ADAAA"), "major life activities" include "major bodily functions," of which "neurological" and "brain" functions are listed in the ADAAA definitions.  42 U.S.C Section 12102(2)(B).

112.     Hence, Ms. Meehan's bi-polar disorder is a disability under the ADAAA.

113.     At the time giving rise to the allegations herein, her bi-polar disorder substantially interfered with her major bodily functions of neurological and brain functioning.

114.     Specifically, her psychological impairment interfered with the major life activities of thinking and being active.

115.     Defendant Loyola treated her differently than it had prior to being on notice of her disability, and it treated Ms. Meehan differently than its other exempt employees, all of which are discriminatory actions under the ADA.

116.     Whereas prior to being on notice of her disability, Loyola worked with Plaintiff to accommodate her needs when she needed to help her ill parents;  once Defendant Loyola was on notice of Plaintiff's disability, however, its tone changed and it refused to work with her to accommodate her needs.

117.     Defendant Loyola was obligated per the ADA to engage in the interactive process with Ms. Meehan once it was on notice that she had a qualified disability.

118.     Defendant Loyola would not allow Ms. Meehan to present her request for an accommodation to Defendant Loyola either prior to November 10, 2014 or through counsel subsequent to its purported ADA letter of February 25, 2015.

119.     Thus, Defendant Loyola refused to engage in the interactive process with Ms. Meehan.

120.     Even worse, Defendant Loyola treated Ms. Meehan as a criminal because she had a mental disability.  Defendant Loyola had never before pressed charges against an employee for criminal trespass and battery for being in the vicinity of its office, notwithstanding its failure to advise its police force that Ms. Meehan had a mental disability and to accord her with the respect that an ill employee of 9 years deserved.

121.     Defendant Loyola also discriminated against Plaintiff by restricting her work hours and no other exempt employee's work hours all because she was disabled.

122.     Ms. Meehan fulfilled conditions precedent to bringing this ADA claim, namely she filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Illinois Department of Human Rights ("IDHR"),[1] and received a Notice of Right to Sue from the EEOC.  The EEOC Charge is attached as Exhibit B and the Right to Sue is attached as Exhibit C to this Complaint.

123.     Defendant Loyola, by disciplining Ms. Meehan, forcing her to take medical leaves without her input and terminating her employment effective when her long term disability benefits have ceased, discriminated against her on the basis of her disability and/or perceived disability and/or record of disability.

---

[1] Upon receipt of the Notice of Dismissal from IDHR, Plaintiff intends to amend this Complaint to include violations of the Illinois Human Rights Act.

124. As a result of this disability discrimination Ms. Meehan has a criminal record, lost her wages, her illness was exacerbated, she incurred medical expenses, her reputation was damaged, and she was caused pain.

125. Defendant Loyola's discrimination against Ms. Meehan was done with malice or reckless disregard for her federally protected rights for which exemplary damages should be awarded.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A) Enjoin Defendant Loyola to train its employees on how to interact and treat employees with mental disabilities;

B) Award back pay, front pay, and any other lost compensation as a result of Defendant Loyola's discrimination in violation of the ADA, as amended;

C) Award prejudgment interest at the prevailing rate on the award of back pay and lost compensation that results from Defendant Loyola's discrimination against her in violation of the ADA, as amended;

D) Award compensatory damages for the harm Ms. Meehan suffered as a result of Defendant Loyola's discrimination against her in violation of the ADA, as amended;

E) Award exemplary damages;

F) Award reasonable attorneys' fees and costs of this action and of prior administrative proceedings; and

G) Any such other relief that this Court deems just and equitable.

## Count II- Hostile Work Environment as to Defendant Loyola

126. Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

127. Ms. Meehan was a qualified individual with a disability per the ADA, as amended.

128. Defendant Loyola subjected Ms. Meehan to unwelcome harassment.

129. Defendant harassed Ms. Meehan based on her alleged disability.

18

130.    The severity and/or pervasiveness of the harassment altered her work environment and created an abusive working environment for Ms. Meehan to which she complained to HR on a number of occasions.

131.    As a result of this hostile work environment Ms. Meehan lost her job, wages, other compensation, incurred medical expenses, suffered pain, and damage to her reputation.

132.    Defendant Loyola created a hostile work environment against Ms. Meehan with malice or reckless indifference to her federally protected rights for which exemplary damages should be awarded.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A)    Award back pay, front pay, and any other lost compensation as a result of Defendant Loyola creating a hostile work environment;

B)    Award prejudgment interest at the prevailing rate on the award of back pay and lost compensation that results from Defendant Loyola having created a hostile work environment;

C)    Award compensatory damages for the harm Ms. Meehan suffered as a result of Defendant Loyola's hostile work environment;

D)    Award exemplary damages to Ms. Meehan;

E)    Award Ms. Meehan her reasonable attorneys' fees and costs of this action and of prior administrative proceedings; and

F)    Any such other relief that this Court deems just and equitable.

### Count III- Intentional Infliction of Emotional Distress as to Defendant Loyola

133.    Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

134.    Defendant Loyola knew that Ms. Meehan suffered bi-polar disorder and was experiencing manic episodes upon her return from Ethiopia where she was sexually assaulted.

135.    Defendant Loyola embarrassing Ms. Meehan, by putting her on its police watch list, restricting access to the office solely to her, having her arrested for criminal trespass and continuing to press charges against her while at the same time giving the appearance it was trying to accommodate her disability under the ADA, amounts to extreme and outrageous conduct.

136.    Defendant Loyola intended to cause Ms. Meehan to suffer severe emotional distress and/or its conduct was so reckless that it had the effect of causing her severe emotional distress.

137.    Defendant Loyola's conduct did in fact cause Ms. Meehan to suffer severe emotional distress.

138.    As a result of Defendant Loyola's conduct Ms. Meehan was hospitalized and continues to receive medical treatment.

139.    In fact, Ms. Meehan's doctor causally relates her severe emotional distress to Defendant Loyola's conduct.

140.    Ms. Meehan has been damaged as a result of Defendant Loyola causing her to suffer severe emotional distress.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A)    Award an amount sufficient to fully and justly compensate her for the damages she suffered;

B)    Award exemplary damages;

C)    Award reasonable costs of bringing this action; and

D)    Such other relief that this Court deems just and equitable.

20

## **Count IV- Tort of Intrusion Upon Seclusion as to all Three Defendants**

141.    Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

142.    At all times giving rise to the allegations herein Defendant Loyola employed Defendants Paprocki and Roman and ordered such Defendants Paprocki and Roman to escort Ms. Meehan from the premises.

143.    Defendants Paprocki and Roman followed Ms. Meehan into the Argo Tea and asked for the keys so that it could enter the bathroom Ms. Meehan was occupying.

144.    Ms. Meehan had every expectation of privacy while she remained in a bathroom that was available for use to members of the general public.

145.    By endeavoring to obtain the key to the washroom and actually entering the washroom that Ms. Meehan was using Defendants pried or intruded upon the affairs or seclusion of Ms. Meehan.

146.    Any reasonable person would be offended by Defendants' conduct of endeavoring to open a bathroom door while it is in use.

147.    Using a bathroom is a private matter.

148.    Invading Ms. Meehan's privacy was proximately caused by Defendants' conduct.

149.    Ms. Meehan suffered emotionally from Defendants' invasion of her privacy.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A)    Award an amount sufficient to fully and justly compensate her for the damages she suffered;

B)    Award exemplary damages;

C)    Award reasonable costs of bringing this action; and

D)    Such other relief that this Court deems just and equitable.

21

## Count V- Assault by Defendants Paprocki and Roman

150.    Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

151.    Defendants Paprocki and Roman continuously followed Ms. Meehan when she was on public streets and in locations open to members of the general public and threatened to arrest her when they saw her merely standing in the vicinity of Defendant Loyola while on public grounds.

152.    Such acts by Defendants Paprocki and Roman created reasonable apprehension in Ms. Meehan of immediate harmful or offensive contact to her person.

153.    By continuously yelling at Ms. Meehan that she must leave public areas, and entering the bathroom she was using and threatening to arrest her was intended by Defendants Roman and Paprocki to bring about apprehension to Ms. Meehan of immediate harmful or offensive contact with her.

154.    Defendants Paprocki and Roman did in fact cause Ms. Meehan to become apprehensive that she would be the subject of unwanted conduct.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A)    Award an amount sufficient to fully and justly compensate her for the damages she suffered;

B)    Award exemplary damages;

C)    Award reasonable costs of bringing this action; and

D)    Such other relief that this Court deems just and equitable.

## Count VI- Battery by Defendant Roman

155.    Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

22

156.     The actions by Defendant Roman in physically grabbing and pushing Ms. Meehan constituted intentional harmful and/or offensive contact with her.

157.     The actions by Defendant Roman were the direct and proximate cause of the injuries Ms. Meehan suffered.

**WHEREFORE**, Plaintiff Ann Meehan respectfully requests that this Court in her favor:

A)     Award an amount sufficient to fully and justly compensate her for the damages she suffered;

B)     Award exemplary damages;

C)     Award reasonable costs of bringing this action; and

D)     Such other relief that this Court deems just and equitable.

### Count VII – Unlawful Search and Seizure

158.     Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

159.     As described herein, by unlawfully detaining and arresting Plaintiff, without probable cause, by unlawfully searching Plaintiff, without probable cause, and by unlawfully subjecting Plaintiff to surveillance, without probable cause, Defendants Roman and Paprocki, and each of them, violated Plaintiff's right to be free from unreasonable searches and seizure, absent probable cause to believe that she had committed the crimes charged and deprived Plaintiff of the rights secured to her by the Fourth Amendment to the United States Constitution, as made applicable to the Defendants by the due process clause of the Fourteenth Amendment.

160.     As a direct result of the Defendants intentionally, knowingly, unlawfully, maliciously, and unconscionably acting in the manner aforesaid, Plaintiff has and will suffer lost wages, benefits and entitlements, damage to her reputation, pain and suffering, physical injury,

humiliation and severe emotional distress and has been deprived of certain rights and privileges as a citizen of the United States.

161.    Defendants, and each of them, acted herein, at all relevant times, with the specific intent that Plaintiff suffer each of the indignities herein described.

162.    Defendants, and each of them, caused Plaintiff's arrest, detention, the personal searches, and the commencement of her subsequent criminal prosecution with a complete and reckless disregard or indifference for Plaintiff's constitutional rights.

163.    As a direct and proximate result of the Defendants' actions, Plaintiff has suffered the following injuries and damages:

    a.    Violation of her constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and seizure of her person and to be accorded equal protection of the law;

    b.    Loss of physical liberty;

    c.    Emotional trauma and suffering, as well as physical injury;

    d.    Attorney's fees and costs.

164.    The actions of the Defendants, and each of them, violated clearly established and well-settled federal constitutional rights of Plaintiff, namely to be free from unreasonable searches and seizures of her person and to be assured the equal protection of the law.

WHEREFORE the Plaintiff demands a trial by jury and respectfully requests that this Court award to her and against each of the Defendants, jointly and severally:

    A)    Nominal damages in an amount to be determined at trial;

    B)    Compensatory damages in an amount to be established at trial;

    C)    Punitive damages in an amount to be determined at trial;

    D)    Her reasonable attorneys' fees pursuant to Section 1988 of Title 42 of the United States Code, in an amount to be established at an appropriate hearing; and

E)     Such other and further relief as this Court shall deem just and proper.

## Count VIII – *Respondeat Superior*

165.     Ms. Meehan realleges paragraphs 1-107 of this Complaint as though fully set forth herein.

166.     At all relevant times, Defendant Roman and Paprocki and each of them, were acting on behalf of and/or within the scope of their employment with the Defendant Loyola.

167.     As a result of the Defendants' conduct, as described herein, Plaintiff is seeking monetary damages, attorney's fees and costs.

168.     Loyola has *respondeat superior* liability for the wrongful acts of its employees and agents acting within the scope of their employment.

WHEREFORE, the Plaintiff demands judgment against Defendant Loyola for compensatory damages awarded against or agreed to be paid by the Defendants, and each of them, as such amounts may be adjudged or determined, that any law enforcement, court or other official record created or generated as a result of the unconstitutional acts alleged herein be expunged, and any other relief the Court deems just and appropriate.

Ann Meehan,
PLAINTIFF


/s/ Helen B. Bloch
_____
By: One of her Attorneys

Helen B. Bloch, ARDC # 6255642
LAW OFFICES OF HELEN BLOCH, P.C.
33 N. LaSalle Street, Suite 3200
Chicago, IL 60602
(312) 281-9931
hbloch@blochpc.com

Deidre Baumann, ARDC # 6209602
BAUMANN & SHULDINER
20 S. Clark Street, Suite 500
Chicago, IL 60603
(312) 553-3119
baumannesq@gmail.com