# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANN MEEHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16 C 10481 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| LOYOLA UNIVERSITY OF CHICAGO, ) | |
| an Illinois Not-for-Profit corporation; ) | |
| ROBERT PAPROCKI; and ALICIA ROMAN, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

After being forced to take a medical leave of absence, Plaintiff Ann Meehan, who worked as a curator for Defendant Loyola University of Chicago ("Loyola"), filed suit against Loyola and two of its campus police officers, Robert Paprocki and Alicia Roman, who were involved in escorting Meehan off Loyola's campus and a subsequent encounter that led to Meehan's arrest for criminal trespassing and battery. Meehan brings claims against Loyola for discrimination and hostile work environment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.*, and for intentional infliction of emotional distress ("IIED"). She also brings claims against Loyola, Paprocki, and Roman for intrusion upon seclusion, assault, battery, and false arrest/imprisonment. Finally, Meehan seeks to hold Loyola responsible for Paprocki and Roman's conduct under a *respondeat superior* theory of liability, bringing a separate claim for this purpose. Loyola, Paprocki, and Roman move to dismiss Meehan's claims for IIED (Count III), intrusion upon seclusion (Count IV), and *respondeat superior* (Count VIII). The Court finds that the IHRA and the Illinois Workers Compensation Act ("IWCA") do not preempt Meehan's

IIED claim and that, at this stage, she has sufficiently alleged outrageous conduct to allow that claim to proceed to discovery. The Court also rejects the application of Defendants' advocated for one-year statute of limitations to the intrusion of seclusion claim because that claim does not involve elements of publication. As such, the intrusion upon seclusion claim is timely. But the Court dismisses Meehan's independent *respondeat superior* claim against Loyola as barred by the IWCA.

## BACKGROUND[1]

In 2005, Loyola hired Meehan as curator of education at the Loyola University Museum of Art ("LUMA"). In that role, among other things, Meehan developed and managed educational programs, trained and managed docents, collaborated with other Loyola departments, and curated exhibitions of art by elementary and high school students. Additionally, Meehan administered internship programs and served as chief editor of LUMA's quarterly newsletter. Her hours varied per week depending on the tasks at hand, with Loyola typically allowing her to set her own hours. Meehan sometimes worked evenings if LUMA hosted an evening program or weekends to prepare for the opening of an exhibition.

In 2006, Meehan received a diagnosis of bipolar disorder. She disclosed this diagnosis to her supervisor, Jonathan Canning, in 2007. She continued to work at LUMA without taking any medical leaves as a result of her bipolar disorder until 2014 and her illness did not appear to affect her work. Meehan received merit salary increases every year between 2006 and 2013 and, in the two performance reviews she received while working for Loyola—in 2008 and 2012—she received ratings of 2.5 or 3 on a scale of 1 through 3, with positive comments.

---

[1] The facts in the background section are taken from Meehan's second amended complaint and the exhibits attached thereto and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

Loyola asked Meehan to take on additional responsibilities, such as grant writing and editing other projects, based on her writing skills. The addition of these tasks to her job responsibilities caused her to work longer hours and, at times, meant that she did not perform her curator responsibilities in as timely a manner as she previously had done. Additionally, her parents, living in New York with Parkinson's and Alzheimer's diseases, both needed her assistance. These issues led to an August 5, 2014 meeting of Meehan, Canning, and the Director of LUMA, where they discussed a plan to help Meehan perform her essential tasks and care for her parents. At that meeting, Loyola agreed to reassign some of Meehan's non-curator duties to others.

In October 2014, after a major exhibit closed on which Meehan worked, Meehan took a scheduled vacation to Ethiopia, intended to last from October 8 to October 27. But on October 15, Meehan sent Loyola an email explaining she had returned to Chicago earlier than planned because a man at a hotel in Ethiopia had sexually assaulted her. She explained she needed several days to recover and asked for privacy. But Meehan resumed some of her work duties on Friday, October 17. The following Monday, October 20, Loyola inquired whether it should treat her time off as sick time or vacation time, even though she was performing some of her work duties from home and at LUMA. The following day, when she was at work at LUMA, Loyola directed her to obtain a physician's release to be at work because she had suggested, although in jest, that she had been home sick all weekend with "what [she hoped was] not malaria." Doc. 24 ¶ 30.

On October 23, LUMA's director sent an email to Loyola's human resources ("HR") personnel, stating that because of Meehan's "manic behavior," she need to be placed on leave. *Id.* ¶ 32. The following day, Meehan met with Loyola HR representatives and formally advised

them that she suffered from bipolar disorder. That same day, Loyola placed her on medical leave until it received a doctor's note indicating she could return to work, which it received the following day.

Despite Meehan previously benefiting from flexible work hours, on November 4, she learned that, going forward, she was to obey a strict 9:00 a.m. to 5:30 p.m. Monday through Friday schedule. Meehan then met with Loyola representatives on November 7 to request accommodations that would allow her to perform her job duties while also seeking medical attention for her bipolar disorder. Instead of discussing this request at the meeting, however, Loyola disciplined Meehan for not advising her supervisor early enough on November 5 of an illness and thus failing to report to work that day. At the end of the meeting, Loyola provided Meehan with a disciplinary report of conference, pamphlets on taking leave under the Family Medical Leave Act, and information on its employee assistance program. Then, on November 9, Loyola informed Loyola police officers that Meehan could not enter LUMA during non-business hours and that she should be refused access and escorted out of LUMA if she was seen there before 8:30 a.m. Loyola did not communicate this information to Meehan.

Things came to a head on November 10. After Meehan had difficulty using a photocopier, which made her late to a docent meeting, Loyola recommended that she go on a medical leave that started immediately. Observing that this distressed Meehan, Loyola called its campus police to escort Meehan out of the building. Paprocki and Roman responded, believing that Meehan had been terminated from her employment and was not allowed on Loyola's premises. Loyola did not correct this misimpression or inform them of Meehan's bipolar disorder. Loyola's HR, Paprocki, and Roman escorted Meehan to her office, where she retrieved her purse and coat, and then out of the building. Meehan requested reentry to her office because

4

she needed to gather additional items, such as her medication, but Paprocki and Roman told her she was not allowed on the premises. Meehan then called her boyfriend, who also worked for Loyola, to assist her. Because she could not hear well on the phone while outside, Meehan entered the lobby of her office building, but Paprocki and Roman ordered her to leave. Meehan vacated the premises and went to wait for her boyfriend on Rush Street. Roman saw her waiting there and told her to leave, warning her that he would arrest her for trespassing if he saw her again. Roman then observed Meehan entering Argo Tea,[2] radioing Paprocki that they "were going to have a problem." *Id.* ¶ 70. Roman followed Meehan into the Argo Tea at Paprocki's direction and saw Meehan enter the women's bathroom. Roman then asked an Argo Tea employee for the key to the women's bathroom, at which point Meehan opened the door. Roman grabbed Meehan and pushed her out of Argo Tea, while Paprocki looked on. Meehan ultimately was arrested and taken to a Chicago police station, where she was held for approximately twelve hours without her medications. Meehan was charged with criminal trespass to land and battery.

On November 18, Meehan checked herself into an inpatient treatment program at Northwestern Hospital for individuals suffering mental disabilities. She left December 2 but two days later began an intensive outpatient program at the Rush Day Hospital.

On February 25, 2015, Loyola sent Meehan a formal letter stating that, under the ADA, it was engaging in the interactive process and inquiring what reasonable accommodations it could provide to enable Meehan to return to work. On March 3, Loyola sent a request to Meehan's doctor for medical information. Meehan's doctor responded that he could not estimate when Meehan could return to work based on the existence of the criminal case stemming from her November 10, 2014 arrest, for which no trial date had been set. Meehan's counsel then sent a

---

[2] Defendants make a point of establishing that the Argo Tea Meehan entered is located in a Loyola-owned building. The Court finds this fact irrelevant for purposes of resolving the pending motion.

letter to Loyola on March 17 seeking to resolve the parties' issues and allow Meehan to return to work. Instead of engaging in discussions, Loyola sent Meehan a letter on March 30 indicating that when her long-term disability ended, so would her employment with Loyola.

On November 4, 2015, Meehan's criminal trial occurred. The judge was not told of Meehan's mental disability. He found Meehan not guilty of criminal trespass but guilty of battery. She was ordered to a year of supervision with no physical contact with Loyola. Meehan has been unable to find other employment, although she continues to be eligible for long-term disability benefits.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

<mark>6</mark>

ANALYSIS

I.  **IIED (Count III)**

Loyola argues that the IHRA and IWCA, 820 Ill. Comp. Stat. 305/5(a), preempt Meehan's IIED claim and, alternatively, that Meehan has failed to sufficiently allege outrageous conduct to state such a claim. The Court addresses these arguments in turn.

   A.  **IHRA Preemption**

The IHRA sets forth a "comprehensive scheme of remedies and administrative procedures" to address alleged human rights violations. *Mein v. Masonite Corp.*, 485 N.E.2d 312, 315, 109 Ill. 2d 1, 92 Ill. Dec. 501 (1985). This "comprehensive scheme" is the "exclusive source for redress of human rights violations" under Illinois law. *Id.* Specifically, the IHRA states that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 Ill. Comp. Stat. 5/8-111(D). "This provision divests courts, both state and federal, of jurisdiction to hear state law claims of civil rights violations unless those claims are brought under the IHRA." *Bell v. LaSalle Bank N.A./ABN AMRO N.A., Inc.*, No. 03 C 0607, 2005 WL 43178, at *2 (N.D. Ill. Jan. 10, 2005); *see Talley v. Wash. Inventory Serv.*, 37 F.3d 310, 312 (7th Cir. 1994) ("[I]n light of the Illinois Human Rights Act, courts have no jurisdiction to hear independent actions for human rights violations.").

To determine whether the IHRA preempts a claim, the Court must decide whether the claim is "inextricably linked" to an alleged violation of an employee's civil rights under the IHRA. *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23, 177 Ill. 2d 511, 227 Ill. Dec. 98 (1997); *Krocka v. City of Chicago*, 203 F.3d 507, 516–17 (7th Cir. 2000). A claim is not inextricably linked to a civil rights violation if the plaintiff can allege its elements "without reference to legal

7

duties created by the [IHRA]." *Maksimovic*, 687 N.E.2d at 23; *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (considering whether plaintiff "can prove the elements of intentional infliction of emotional distress independent of legal duties furnished by the IHRA," collecting cases).

To recover for IIED, Meehan must allege that "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendants' conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas v. Fuerst*, 803 N.E.2d 619, 625, 345 Ill. App. 3d 929, 281 Ill. Dec. 215 (2004)). To be considered extreme and outrageous, the conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211, 154 Ill. 2d 1, 180 Ill. Dec. 307 (1992)). Here, Meehan alleges conduct that would constitute a tort regardless of Loyola's, and its police officers', motives. She claims that Loyola placed her on a police watch list, restricted the hours during which she could be at work, had her arrested for criminal trespass, and continued to press this charge, on which she was ultimately found not guilty. Although Meehan incorporates her disability discrimination allegations into her IIED claim, "the proper inquiry [is] not whether the facts that support [Meehan's] intentional infliction of emotional distress claim could also have supported a discrimination claim, but instead whether [Meehan] can prove the elements of intentional infliction of emotional distress independent of legal duties furnished by the IHRA." *Naeem*, 444 F.3d at 604. Here, the Court concludes that she can do so because her allegations do not depend solely on discrimination based on her disability, where, for example, Meehan alleges

8

that Paprocki and Roman, who arrested her for criminal trespass, did not even know of her disability. *See Spring-Weber v. City of Chicago*, No. 16 C 8097, 2017 WL 1316267, at *9 (N.D. Ill. Apr. 10, 2017) (finding IHRA did not preempt IIED claim where plaintiff alleged "she was placed on involuntary leave, confined to her home, forced to undergo drug and psychiatric testing, denied compensation for medical treatment, transferred to a remote location, denied transfers or promotions to others positions, and denied the ability to schedule her furlough days"); *Hernandez v. Cook County Sheriff's Office*, 76 F. Supp. 3d 739, 745–46 (N.D. Ill. 2014) (finding that IIED claim was not inextricably linked to retaliation claim where plaintiff sought redress for "unwarranted criminal investigation").

### B. IWCA Preemption

Next, Loyola contends that the IWCA preempts Meehan's IIED claim. The IWCA provides the exclusive remedy for accidental injuries that employees sustain in the course of their employment. 820 Ill. Comp. Stat. 305/5(a); *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1225, 139 Ill. 2d 455, 151 Ill. Dec. 560 (1990). But Meehan can bring her IIED claim against Loyola if she establishes "(1) that the injury was not accidental; (2) that the injury did not arise from . . . her employment; (3) that the injury was not received during the course of employment; or (4) that the injury was not compensable under the [IWCA]." *Meerbrey*, 564 N.E.2d at 1226. Accidental injuries are those that "happen[ ] without design" or are "unforeseen by the person to whom it happens." *Id.* (quoting *Pathfinder C. v. Industrial Comm'n*, 343 N.E.2d 913, 917, 62 Ill. 2d 556 (1976)). Injuries inflicted by co-workers are considered accidental unless the employer directed or expressly authorized the assault. *Id.* Meehan argues that Loyola expressly authorized or committed the acts forming the basis of her IIED claim, placing her on the police watch list, restricting her access to LUMA, and authorizing Paprocki

9

and Roman's actions by instructing them to ensure that she stayed away from Loyola property. Although Loyola argues that Meehan's allegations on the issue are conclusory, they suffice at this stage for Meehan to avoid the IWCA's preemptive effect.

### C. Outrageous Conduct

Alternatively, Loyola argues that Meehan has failed to sufficiently plead outrageous conduct so as to state an IIED claim. Courts are reluctant to allow IIED claims to proceed in the employer/employee context, "the concern being that doing so would authorize IIED claims by most workers who are terminated or even disciplined." *Reed v. Colo. Tech. Univ.*, No. 15 C 3368, 2016 WL 1019830, at *5 (N.D. Ill. Mar. 15, 2016) (citing *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001)). But the Court may find an IIED claim actionable in the employer/employee context "where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker*, 256 F.3d at 491. Here, although some could view Meehan's complaints about Loyola's conduct, although inappropriate, not to rise to the level required for a viable IIED claim, the Court must consider Loyola's actions against Meehan's allegations that Loyola acted while knowing her particular susceptibility to emotional distress because of her bipolar disorder and the sexual assault she had experienced on her recent trip to Ethiopia. "[B]ehavior that otherwise might be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional turmoil." *Id.* at 492. Taking Loyola's knowledge into consideration, at this stage, the Court cannot definitively conclude that Meehan has not pleaded that Loyola's actions did not amount to extreme and outrageous conduct. Although Meehan may not ultimately establish this element, the Court finds that she has met her pleading burden at this stage.

## II. Intrusion upon Seclusion (Count IV)

Loyola, Paprocki, and Roman argue that the Court should dismiss Meehan's intrusion upon seclusion claim as untimely. Illinois courts have not definitively established the proper statute of limitations applicable to intrusion upon seclusion claims. Loyola, Roman, and Paprocki advocate for the application of the one-year statute of limitations provided by § 13-201, which would make Meehan's claim time-barred. 735 Ill. Comp. Stat. 5/13-201 ("Actions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued."). Meehan, on the other hand, contends that § 13-201 does not apply, which would allow her claim to proceed. *See Benitez v. KFC Nat'l Mgmt. Co.*, 714 N.E.2d 1002, 1007–08, 305 Ill. App. 3d 1027, 239 Ill. Dec. 705 (1999) (one-year statute of limitations provided by § 13-201 does not apply to intrusion upon seclusion claim).

In *Benitez*, the court examined the various types of privacy torts, noting that publication was a required element of the torts of public disclosure of private facts, appropriation of another's name of likeness, and false-light publicity but not of intrusion upon seclusion. *Benitez*, 714 N.E.2d at 1007. The court found this distinction "crucial, since the plain language of section 13-201 indicates that the one-year statute of limitations governs only libel, slander and privacy torts involving publication," and not intrusion upon seclusion, which lacks such an element. *Id.*; *see also McDonald's Corp. v. Levine*, 439 N.E.2d 475, 479, 108 Ill. App. 3d 732, 64 Ill. Dec. 224 (1982) (refusing to apply one-year statute of limitations of what is now § 13-201 to eavesdropping claims, to the extent they could be found to be intrusion upon seclusion claims, because it only applies to claims for slander, liber, or "publication of matters violating the right to privacy"). Although Loyola, Paprocki, and Roman rely on two cases that applied § 13-201 to intrusion upon seclusion claims, those cases provide no independent reasoning for doing so. *See*

*Hrubec v. Nat'l R.R. Passenger Corp.*, 778 F. Supp. 1431, 1435–36 (N.D. Ill. 1991), *rev'd on other grounds*, 981 F.2d 962 (7th Cir. 1992); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 746 F. Supp. 798, 806 (N.D. Ill. 1990), *aff'd*, 957 F.2d 317 (7th Cir. 1992). The Court finds the reasoning in *Benitez* persuasive—that § 13-201 requires an element of publication to apply. *See Jackson v. Bank of New York*, No. 11-cv-6410, 2012 WL 2503956, at *5 (N.D. Ill. June 28, 2012) (following *Benitez* in rejecting application of § 13-201 to intrusion upon seclusion claim). Therefore, § 13-201 does not apply to Meehan's intrusion upon seclusion claim, which may proceed to discovery.

### III. *Respondeat Superior* (Count VIII)

Finally, Loyola seeks dismissal of Meehan's independent claim asserting *respondeat superior* liability against Loyola for Paprocki and Roman's actions. Loyola argues that the IWCA bars Meehan from holding Loyola liable for the actions of its employees solely based on *respondeat superior*. *See Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1004 (N.D. Ill. 2013) (the IWCA "bar[s] employees from bringing common law actions against their employers based solely upon the doctrine of *respondeat superior*" (quoting *Meerbrey*, 564 N.E.2d at 1227)). Additionally, Loyola points out that Meehan has included Loyola as a defendant in the state law claims asserted against Paprocki and Roman, thus making any attempt at holding Loyola liable by way of a *respondeat superior* theory duplicative.

Meehan responds simply by repeating her arguments that IWCA preemption does not apply in her case. But regardless of whether IWCA preemption applies, Meehan cannot hold Loyola responsible for Paprocki or Roman's actions solely based on a *respondeat superior* theory. *See Meerbrey*, 564 N.E.2d at 1227. Additionally, the Court finds the relief Meehan seeks with this claim duplicative because Meehan already includes Loyola as a defendant in each

12

claim asserted against Paprocki and Roman.  Therefore, the Court dismisses Meehan's independent *respondeat superior* claim against Loyola.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' partial motion to dismiss Meehan's second amended complaint [27].  The Court dismisses the *respondeat superior* claim (Count VIII) with prejudice.  The Court orders Loyola, Paprocki, and Roman to answer the remaining allegations of the second amended complaint by June 16, 2017. Additionally, the Court strikes the status date set for June 6, 2017 and resets it to September 13, 2017 at 9:30 a.m.

Dated: June 5, 2017

_____
SARA L. ELLIS
United States District Judge